UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| SUPER DUPER, INC., dba<br>SUPER DUPER PUBLICATIONS,<br>a South Carolina corporation,<br><br>   Plaintiff and<br>   Counterdefendant,<br><br> vs.<br><br>MATTEL, Inc., a Delaware corporation,<br><br>   Defendant and<br>   Counterclaimant. | CASE NO. 6:05 -cv-1700-HFF |
| AND RELATED COUNTERCLAIMS. | |

**DEFENDANT AND COUNTERCLAIMANT MATTEL, INC.'S MOTION FOR ENTRY
OF JUDGMENT, FOR PERMANENT INJUNCTION, FOR ORDER OF
CANCELLATION, AND FOR INCREASED PROFITS PURSUANT TO 15 U.S.C. § 1117
OR, IN THE ALTERNATIVE, TO ALTER OR AMEND JUDGMENT**

Pursuant to 15 U.S.C. § 1116 and FRCP 54(b) and 58(b), Defendant and Counterclaimant

Mattel, Inc. ("Mattel"), respectfully moves for the immediate entry of a judgment including a

permanent injunction permanently enjoining Plaintiff and Counterdefendant Super Duper, Inc.

("Super Duper") from continued infringement of Mattel's SEE 'N SAY, SEE 'N SAY JUNIOR,

SEE N' SAY BABY and THE FARMER SAYS trademarks (collectively, "Mattel's SEE 'N

SAY Marks") and from continued dilution of Mattel's SEE 'N SAY and THE FARMER SAYS

trademarks through Super Duper's holdover use of its SEE IT! SAY IT!; SAY AND SING;

FISH AND SAY; FISH & SAY; SORT AND SAY; SORT & SAY and SAY AND SORT marks

("the Infringing Marks").

1

Pursuant to 15 U.S.C. § 1119, Mattel seeks entry of judgment for an order of cancellation of Super Duper's trademark registrations of FISH & SAY (U.S. Reg. No. 2,666,686) and of SEE IT! SAY IT! (U.S. Reg. No. 2,504,141), and an order directing the Commissioner of Trademarks of the U.S. Patent & Trademark Office ("PTO") to abandon the application to register SORT AND SAY (U.S. Serial No. 78/252,179).

Pursuant to 15 U.S.C. § 1117, Mattel seeks entry of judgment to increase the profits awarded by the jury to Mattel in the Court's discretion.

Alternatively, pursuant to FRCP 59(e), Mattel seeks to amend or alter the judgment entered on April 29, 2008 to increase the profits awarded, enter the injunction, and enter an order for cancellation.  Mattel requests entry of judgment in the form submitted herewith.

## I.     STATEMENT OF RELEVANT FACTS

On April 25, 2008, the jury in this case adjudged that Mattel's SEE 'N SAY and THE FARMER SAYS trademarks were famous and that each of the Infringing Marks infringe Mattel's SEE 'N SAY Marks and dilute the distinctive nature of Mattel's SEE 'N SAY and THE FARMER SAYS trademarks.  The jury also found that Super Duper's dilution of Mattel's SEE 'N SAY and THE FARMER SAYS trademarks was intentional.  Based on its findings, the jury awarded Mattel $400,000 of Super Duper's profits from the Infringing Marks.

Despite the verdict, Super Duper continues to advertise and sell products bearing the Infringing Marks, and issued a press release on May 6, 2008 insisting that they do not infringe or dilute Mattel's rights in its SEE 'N SAY trademarks.  (Pietrini Decl. ¶ 4, Ex. B, ¶ 7, Ex. E.) Because Super Duper is now an adjudged infringer and diluter of Mattel's trademark rights and has no intention of stopping, the Court should permanently enjoin Super Duper from engaging in any future infringing and diluting conduct, including the manufacture, sale, promotion,

advertisement or publicity of any goods bearing or offered under the Infringing Marks or any other mark, name, symbol or logo that a colorable imitation of, is confusingly similar to, or likely to dilute Mattel's SEE 'N SAY Marks.

Mattel also seeks an order from the Court directing the Commissioner of Trademarks of the PTO to cancel Super Duper's registrations of SEE IT! SAY IT! and FISH & SAY, and to deny registration of SORT AND SAY. Mattel's proceedings in the PTO relating to these marks were suspended pending the outcome of this case. (Exhibit 1, Pietrini Decl. ¶¶ 9-12, Exs. G-I.) Since the registration of these trademarks was put at issue in this case by the parties, the Court should now direct the PTO to cancel registrations of SEE IT! SAY IT! and FISH & SAY and abandon the application to register SORT AND SAY under 15 U.S.C. § 1119.

Finally, Mattel seeks to adjust the profits awarded by the jury under 15 U.S.C. § 1117(a). Specifically, Mattel seeks to invoke the Court's discretion to increase profits because the profits awarded were $400,000; however, the evidence supported a profit award of $999,113 attributable to the Infringing Marks. The jury allocated profits for trademarks where there was no evidence of gross sales, and decreased some of the profits inexplicably. Super Duper did not submit credible evidence of costs and deductions from the gross revenue for the Infringing Marks. Indeed, Super Duper's financial expert relied upon a complicated formula to make up deductible costs where there was no documentary evidence for twelve of the nineteen years. In addition, upon cross-examination, Super Duper's expert conceded that, due to the missing financial information, he was unable to comply with the standard he set out in his first report in calculating profits in his second report. The only credible evidence available to the jury on Super Duper's profits was from Mattel's financial expert Charles Phillips. Mattel leaves it to the Court's discretion as to the amount to increase or adjust the award of profits to Mattel under the

Court's discretion afforded it under 15 U.S.C. § 1117(a).  Alternatively, because the judgment is one that must be entered by the Court under FRCP 58(b)(2), Mattel seeks entry of judgment in the form submitted herewith pursuant to FRCP 54(a)(b).

## II.     A PERMANENT INJUNCTION SHOULD BE ENTERED

The Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation" of a trademark owner's trademark rights.  Injunctive relief applies to infringement and dilution claims.  15 U.S.C. § 1116(a).  Generally, in the Fourth Circuit, the trademark owner is entitled to injunctive relief because "regardless of any potential injury to sales or to the mark itself, trademark infringement primarily represents an injury to reputation."  *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 939 (4th Cir. 1995) .  The Fourth Circuit also noted that "[A]n injunction is the preferred remedy to insure that future violations will not occur . . ." *Id*; (*see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180-81 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.").  District Courts in the Fourth Circuit concur.  *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, 14 U.S.P.Q.2d 1497, 1510 (D.Md. 1989) ("An injunction is also the standard remedy in unfair competition cases, including trademark infringement under 15 U.S.C. § 1125(a) and the common laws"), *aff'd in unpublished op.*, 13 U.S.P.Q.2d 2025 (4th Cir. 1990).

The Fourth Circuit holds that a permanent injunction may be granted without a specific hearing on the issue when there have already been findings on liability.  *See Lone Star Steakhouse*, 43 F.3d at 939 ("Having already determined that Alpha committed trademark infringement, the district court had made the findings necessary to grant the injunction.").  In

other words, Fourth Circuit case law, along with other circuits, states that owners of infringed trademarks are not likely to have an adequate remedy at law due to the very nature of the injury resulting from the trademark infringement (*i.e*., the inherent injury to the goodwill in the trademarks and reputation of the trademark owner) and are therefore entitled to injunctive relief.

This case is no exception.  This is a trademark infringement and dilution case that Super Duper brought for a declaration that all of its AND SAY trademarks at issue did not infringe or dilute Mattel's SEE 'N SAY Marks.  Mattel was required to assert compulsory counterclaims as to all of the trademarks that Super Duper brought into this case.  FRCP 13(a).  Mattel sought to protect its rights and investment in its SEE 'N SAY Marks as well as the consumer goodwill that it had established in those trademarks over the past 43 years.  The jury adjudged that the Infringing Marks infringe Mattel's SEE 'N SAY Marks and dilute Mattel's famous SEE 'N SAY and THE FARMER SAYS trademarks.  As a consequence, Mattel has suffered irreparable injury resulting from Super Duper's infringement and dilution, and is therefore entitled to a permanent injunction against continued infringement and dilution by Super Duper.

As shown below, Super Duper has continued its use of its Infringing Marks unabashed since the jury's verdict, and has no intention of stopping.  A permanent injunction is required in this case to protect Mattel's rights in its SEE 'N SAY Marks.  Mattel respectfully requests that its motion be granted and that this Court immediately enter a permanent injunction in the form of the attached proposed judgment.

A.     **The Standard for Entry of a Permanent Injunction**

In 2006, the Supreme Court, in *eBay Inc. v. MercExchange, LLC*, 126 S. Ct. 1837, 1839 (2006), reiterated the longstanding test for entry of a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test

5

> before a court may grant such relief.  A plaintiff must demonstrate:
> (1) that it suffered an irreparable injury; (2) that remedies available
> at law, such as monetary damages, are inadequate to compensate
> for that injury; (3) that, considering the balance of hardships
> between the plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be disserved
> by a permanent injunction.

The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts.  Such discretion must be exercised consistent with traditional principles of equity. *eBay*, 126 S. Ct. at 1841.

Though the *eBay* decision was a case involving allegations of patent infringement, many courts have applied these same "traditional equitable principles" in granting permanent injunctions for allegations of trademark infringement or trademark dilution.  *See Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126 (9th Cir. 2006); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *Burgess v. Gilman*, 475 F.Supp.2d 1051, 1055 (D. Nev. 2007); *MPS IP Services Corp. v. Modis Communications Inc.*, No. 06-270, 2007 WL 723841 (M.D. Fla. March 6, 2007); *Microsoft Corp. v. McGee*, 490 F.Supp.2d 874, 882 (S.D. Ohio 2007); *Western Union Holdings, Inc. v. Eastern Union, Inc.*, No. 06-1408, 2007 WL 2683714 (N.D. Ga. Sept. 7, 2007); *Nike, Inc. v. Nikepal International, Inc.*, No. 05-1468, 2007 WL 2688499 (E.D. Cal. Sept. 10, 2007); *Panda Investments, Inc. v. Jabez Enterprises, Ltd.*, No. 07-114, 2007 WL 4556785 (N.D. Iowa Dec. 20, 2007).  While the Fourth Circuit has not expressly adopted the Supreme Court's ruling for cases of trademark infringement and dilution, analysis of the "traditional equitable principles" has the same result -- the principles decidedly weigh in favor of injunctive relief in this case.

### B.     Mattel Has Suffered Irreparable Injury

Demonstrating a likelihood of confusion is generally sufficient in trademark infringement or dilution cases to permit a presumption that the plaintiff will suffer irreparable harm.  *Vision*

*Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir. 1989); *see also Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) ("[A] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears."); *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (Holding that the complete injury from trademark infringement "almost inevitably results in irreparable injury that is not fully compensable in damages"), *cert. denied*, 434 U.S. 1070 (1978); *Audi*, 469 F.3d at 550 (finding that Audi would be irreparably harmed if the injunction did not issue). In other words, irreparable harm to reputation and goodwill is often presumed as a matter of law where, as here, the plaintiff has demonstrated a likelihood of confusion arising from the infringement. *Metro Publishing Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993) ("Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.").

While explicitly stating that it has not yet applied such a presumption in trademark actions, the Fourth Circuit has recognized that "irreparable injury **regularly** follows from trademark infringement." *Lone Star Steakhouse*, 43 F.3d at 939 (emphasis added); *accord*, *Sara Lee Corporation v. Kayser-Roth Corporation*, 81 F.3d 455, 468 (4th Cir. 1996) (Summary judgment reversed with instructions to enter judgment for the plaintiff and to enter a permanent injunction against the defendant); *Resorts of Pinehurst, Inc. v. Pinehurst National Corporation*, 148 F.3d 417, 423 (4th Cir. 1998) ("We conclude however, that as a matter of law the district court should have granted [the plaintiff] a permanent injunction restraining [the defendants] from infringing [the plaintiff's] mark, PINEHURST"). *Seidelmann*, 14 U.S.P.Q.2d at 1510 ("Because the Court has found trademark infringement and unfair competition it will enter a permanent injunction in this case.") Specific evidence of irreparable harm is not required. *Lone Star*

*Steakhouse*, 43 F.3d at 939.  The Fourth Circuit, in quoting an Eastern District of Virginia

decision, concurred that:

> [Infringement] gives rise to irreparable injury, in that [the
> trademark owner] has lost control of its business reputation to this
> extent, there is substantial likelihood of confusion to the
> purchasing public, there may be no monetary recovery available,
> and there is an inherent injury to the good will and reputation of
> [the trademark owner].

*Id.* at 939 (quoting *Philip Morris Inc. v. MidWest Tobacco Inc.*, 1988 U.S. Dist. LEXIS 16787,

*21 (E.D. Va. 1988)).

Here, Mattel has invested substantial time, effort and money in advertising and promoting

Mattel's SEE 'N SAY Marks throughout the United States, including South Carolina.  As a

result, Mattel's SEE 'N SAY Marks are widely recognized trademarks in the U.S., and Mattel

has established significant consumer goodwill in those trademarks.  The jury agreed, finding that

the trademarks SEE 'N SAY and THE FARMER SAYS are famous.  Super Duper attempted to

trade-in on Mattel's goodwill by selling its own products under a series of trademarks that inched

closer and closer to Mattel's SEE 'N SAY Marks.  At trial, the jury found that the Infringing

Marks are likely to cause confusion with Mattel's SEE 'N SAY Marks and therefore infringed

Mattel's SEE 'N SAY Marks, and the Infringing Marks are likely to dilute Mattel's famous SEE

'N SAY and THE FARMER SAYS trademarks.  As a result of the likelihood of confusion and

dilution, Mattel suffers irreparable injury in the form of a loss of control of its consumer

goodwill that it has established in its goods sold under Mattel's SEE 'N SAY Marks.  The

damage to Mattel's reputation that it has established through Mattel's SEE 'N SAY Marks is

immeasurable.  Continued infringement and dilution by Super Duper of Mattel's SEE 'N SAY

Marks will only serve to continue to erode Mattel's goodwill that it has established in Mattel's

SEE 'N SAY Marks.  *Lone Star Steakhouse*, 43 F.3d at 939; *See AMP Inc. v. Foy*, 540 F.2d 1181, 1184 (4th Cir. 1976).

Further, Mattel introduced evidence of actual confusion at trial.  Specifically, Mattel's Director of Marketing for its Fisher-Price division testified that he entered the term "SEE IT SAY IT" into the eBay search engine and Mattel's SEE 'N SAY BABY product was shown in the search results, but not Super Duper's SEE IT! SAY IT! product.  (Pietrini Decl. ¶ 13, Ex. J.) Even Super Duper's counsel and its Chief Executive Officer could not distinguish between Mattel's SEE 'N SAY mark and Super Duper's SORT AND SAY mark.  They both used the names interchangeably.  At least Super Duper's counsel tried to correct himself -- Super Duper's Chief Executive Officer never even noticed.  (Pietrini Decl. ¶ 14, Ex. K.)  Those slips of the tongue constitute actual confusion.  *Century 21 Real Estate,* 846 F.2d at 1179.  This evidence of actual confusion and association of the parties' trademarks clearly demonstrates that unless permanently enjoined, Mattel's trademark rights will continue to be harmed by Super Duper's use of the Infringing Marks.

This equitable factor heavily favors granting a permanent injunction.

### C.     Mattel Has No Adequate Remedy At Law

Generally, money damages are inadequate where a party has been found to be engaging in acts of violating another's trademark rights.  "Indeed, an injunction is the preferred remedy to insure that future violations will not occur while damages may also be granted to compensate for past injuries."  *Lone Star Steakhouse*, 43 F.3d at 939, quoting *Philip Morris*, 1988 U.S. Dist. LEXIS 16787, at *20-21 (citation omitted).  The Fourth Circuit has further recognized that "regardless of any potential injury to sales or to the mark itself, trademark infringement primarily represents an injury to reputation."  *Lone Star Steakhouse*, 43 F.3d at 939.

As previously stated, Mattel suffered irreparable injury to the consumer goodwill and reputation that it has established in its SEE 'N SAY Marks as a result of Super Duper's infringement of Mattel's SEE 'N SAY Marks and dilution of Mattel's famous SEE 'N SAY and THE FARMER SAYS trademarks.  The future injury to the consumer goodwill in Mattel's SEE 'N SAY Marks and to Mattel's reputation cannot be measured monetarily.  Rather, the award of Super Duper's profits by the jury was as a result of past acts of infringement or dilution, since it could not enter a double recovery for Mattel.  A permanent injunction is appropriate to insure that Super Duper will not continue to cause Mattel irreparable injury through persistent infringement and dilution of Mattel's SEE 'N SAY Marks.  Super Duper's infringing conduct is not going to stop without a Court order.  Since the jury verdict, Super Duper's conduct brazenly continues, and Super Duper boldly states in its press release that it will appeal the jury verdict "this week" because it does not believe that it has engaged in acts of infringement or dilution.  Super Duper's slanted and self-serving press release has already resulted in consumers pledging to boycott Mattel products, thereby increasing the harm to Mattel from Super Duper's acts.  (Pietrini Decl. ¶¶ 7-8, Ex. E-F.)

This equitable factor again favors granting a permanent injunction.

### D.    The Balance Of Hardships Weighs In Favor Of A Permanent Injunction

An injunction is appropriate in cases of trademark infringement and dilution because it would not impair the interests of any third parties or significantly harm the legitimate business interests of any third parties or significantly harm the legitimate business interests of the infringer.  *Philip Morris*, 1988 U.S. Dist. LEXIS 16787, at *22.  The Court has the additional duty to protect consumers from any continued or future confusion that is likely to result from purchases of goods sold under the infringing trademarks.  *Id.*

In balancing the hardships in this case, the legal hardship to Super Duper as a result of a permanent injunction is minimal. Super Duper would simply be required to comply with the law by refraining to make, sell, and advertise products under the Infringing Marks. *Microsoft*, 490 F.Supp.2d at 883. Super Duper cannot complain about any hardship since it was found to have engaged in willful acts of trademark dilution. *See Helene Curtis*, 560 F.2d at 1333. By contrast, there is a risk of substantial hardship to Mattel because Super Duper's continued use of the Infringing Marks will continue to irreparably harm the consumer goodwill that Mattel has established in Mattel's SEE 'N SAY Marks and its reputation as a whole.

The Court also has a substantial interest in protecting future consumers from potential confusion and deception that would result from the continued manufacture, sale, and advertisement of Super Duper's products under the Infringing Marks. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1251 (4th Cir. 1970 ("In sum, the evidence establishes that the likelihood of confusion is sufficient to impair the public's interest in accurately identifying the businesses and to prejudice [the trademark owner's] image. Either of these possibilities is enough to justify an injunction to protect [the trademark owner's] name.")

The balance of hardships weighs heavily in Mattel's favor.

### E.    The Public Interest Is Served By A Permanent Injunction

It is well established that trademark law protects not only the private interests of the trademark owner, but also the public's interest in not being confused by the infringing products. *Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n. 14 (1982) ("[T]he infringer deprives consumers of their abilities to distinguish among goods" of competitors.). "Thus, the purchasing public is an unnamed party in every action for trademark infringement." *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 640 F. Supp. 928, 932 (S.D.N.Y. 1986).

An important case on this point comes from the Third Circuit, which states that in the context of trademark litigation, public interest is just "a synonym for the right of the public not to be deceived or confused." *Optician's Association of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990). Following this logic, the public interest would presumptively be served by an injunction if there were already a determination that consumers were likely to be confused. *Resource Lenders, Inc. v. Source Solutions, Inc.*, 404 F.Supp.2d 1232, 1250 (E.D Cal. 2005) ("Here, because a likelihood of confusion was demonstrated, the public interest would be served by issuance of an injunction.")

The Fourth Circuit has agreed that "an injunction in [a trademark infringement case] would serve the public interest by preventing future consumers from being misled" in addition to protecting the goodwill and reputation of the trademark owner. *Lone Star Steakhouse*, 43 F.3d at 939; *see also Philip Morris*, 1988 U.S. Dist. LEXIS 16787, at *22 ("[T]he public interest would be served by the issuance of an order enjoining the sales of cigarettes under the MidWest trade dress and thereby preserving the reputation and goodwill of MARLBORO.")

This case is no different. The jury found that each of the Infringing Marks infringe Mattel's SEE 'N SAY Marks and that Super Duper intentionally diluted Mattel's famous SEE 'N SAY and THE FARMER SAYS trademarks. The public interest is not served by consumer confusion that exists in the marketplace. The Court also has an interest in protecting consumers from any continued or future confusion and to protect trademark owners from dilutive trademarks in the marketplace.

The public interest would be served if this Court issued a permanent injunction in this case.

In sum, all of the equitable factors favor entry of a permanent injunction in this case. If an injunction is not entered, the jury verdict will be meaningless because Super Duper can continue its unlawful acts, all to the detriment of Mattel and its well-known SEE' N SAY Marks.

## III.    AN ORDER OF CANCELLATION AND ORDER DENYING REGISTRATION MUST ISSUE

Mattel hereby requests that, pursuant to 15 U.S.C. §1119, the Court order cancellation of the registrations of the trademarks SEE IT! SAY IT! and  FISH & SAY, and prevent the registration of SORT AND SAY,[1] now that the jury has found that there is a likelihood of confusion and a likelihood of dilution between these marks and Mattel's SEE 'N SAY Marks.

Courts supervising trademark proceedings have the power to "order the cancellation of registrations." 15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration, *order the cancellation of registrations*, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.") (emphasis added). Cancellation can be ordered based on several enumerated grounds, including a likelihood of confusion or likelihood of dilution with a prior trademark. 15 U.S.C. § 1064.

In this case, the jury found that there is a likelihood of confusion between the Infringing Marks and Mattel's SEE 'N SAY Marks, and a likelihood of dilution of Mattel's SEE 'N SAY and THE FARMER SAYS trademarks. Accordingly, it is now the Court's duty to order cancellation of the registrations of SEE IT! SAY IT! and FISH & SAY, and deny registration to SORT AND SAY pursuant to 15 U.S.C. § 1119. As noted by the Ninth Circuit Court of Appeals, it is the "court's duty to give effect to a jury verdict" by ordering cancellation. *Gracie*

---

[1]    Mattel also alleged a Section 1119 claim against Super Duper's application to register SAY AND SORT.  However, Super Duper let that application go abandoned during the pendency of

*v. Gracie*, 217 F.3d 1060, 1065 (9th Cir. 2000) ("Once the district court gave the jury the power to determine the validity of Rorion Gracie's federal service mark, refusing to cancel the registration for 'Gracie Jiu-Jitsu' after the jury declared it to be incapable of serving as a mark was inconsistent with the court's duty to give effect to a jury verdict, and as such erroneous.")  If a court fails to cancel a registered trademark once a jury has found that a grounds for cancellation exists, then it is error.  *Id*.

It is not sufficient for the Court to merely state that the trademark is invalid or that the party is enjoined from using it.  Instead, the Court must take the step of ordering the cancellation of the trademark registrations and denial of registration to the application:

> We must first decide whether the district court erred in refusing to order cancellation of Rorion's federal registration for "Gracie Jiu-Jitsu" pursuant to its power over registrations under 15 U.S.C. § 1119.  Consistent with the jury verdict finding that Rorion did not have a valid federal service mark for "Gracie Jiu-Jitsu," the district court issued an amended judgment containing the following language: "It is also ORDERED, ADJUDGED, and DECREED that defendants do not have a valid service mark for the name GRACIE JIU-JITSU."  Carley argues that the district court erred in refusing to order cancellation of Rorion's federal registration for "Gracie Jiu-Jitsu" following the jury's finding of invalidity.
>
> * * *
>
> Although there is a paucity of case law on point (perhaps because the situation at hand is rather unusual), the issue before us is not difficult to resolve.  *Once the district court gave the jury the power to determine the validity of Rorion Gracie's federal service mark, refusing to cancel the registration for "Gracie Jiu-Jitsu" after the jury declared it to be incapable of serving as a mark was inconsistent with the court's duty to give effect to a jury verdict, and as such erroneous.*
>
> * * *
>
> In cases not involving jury trials, district courts have been reversed for refusing to order the cancellation of registrations for claimed

this case.  (Pietrini Decl., ¶ 15, Ex. L).  Mattel requests that the Court take judicial notice of this fact.

marks found to be incapable of serving as valid marks.  *See, e.g.,
American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d
3, 13-14 (5th Cir. 1974); *Bascom Launder Corp. v. Telecoin Corp.*,
204 F.2d 331, 335-36 (2d Cir. 1953) ("Nether evidence so clearly
shows that the mark was merely descriptive that the judge should
have directed the cancellation of its registration."); *cf.
International Order of Job's Daughters v. Lindeburg & Co.*, 727
F.2d 1087, 1091 (Fed. Cir. 1984) (holding that under the doctrine
of issue preclusion, the Ninth Circuit's earlier determination that a
name and emblem did not serve as a trademark required
cancellation of the registration).  These cases support our
conclusion that the district court erred in refusing to cancel a mark
found to be invalid.  While it was within the district court's power
to reject the jury's verdict of invalidity as against the weight of the
evidence, the district court did not do so, explicitly denying
Rorion's motion for judgment as a matter of law after the jury
verdict of invalidity.  In light of the jury verdict, which the district
court allowed to stand, the district court should have ordered
cancellation of Rorion's federal registration for "Gracie Jiu-Jitsu."

*Gracie*, 217 F.3d at 1066 (emphasis added).

Respectfully, it is now the Court's duty to give effect to the jury's verdict by ordering the

PTO to cancel the registrations of SEE IT! SAY IT! and FISH & SAY, and deny registration of

SORT AND SAY.

IV.    **THE COURT SHOULD AMEND THE JUDGMENT TO INCREASE THE
AMOUNT OF AWARDED PROFITS OR, ALTERNATIVELY, ENTER THE
JUDGMENT PROPOSED BY MATTEL**

A.    **The Court has Discretion to Adjust the Award of Profits**

The Lanham Act specifically provides:  "The court shall assess such profits . . . or cause

the same to be assessed under its direction."  Further, the Act provides:  "If the court shall find

that the amount of the recovery based on profits is either inadequate or excessive the court may

in its direction either judgment for such sum as the court shall find to be just according to the

circumstances of the case."  15 U.S.C. § 1117(a).  Thus, the Lanham Act makes clear that the

award of profits is ultimately a matter for the Court.

Because Mattel is the trademark owner and asserted counterclaims under 15 U.S.C.

15

§ 1117(a), it is entitled to Super Duper's profits.  The jury agreed, and awarded Mattel $400,000 in profits.  As set out above, the Court is the ultimate decider of the amount of profits to be awarded, and when the Court submits the question of profits to the jury, the Court has the power in its discretion to adjust the amount of profits awarded by the jury.

Where the award of profits is inadequate based on the amount of total profit, or is otherwise inadequate to make infringement unprofitable, it is an abuse of discretion for the Court not to adjust the profits under 15 U.S.C. § 1117(a).  *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1275 (9th Cir. 1982) (District court decision reversed for awarding only 10% of profits proved at trial); *Accord*, *Reebok International, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) ("Although the relief provided by § 1117 is explicitly 'subject to principles of equity', we have held that it is a *per se* abuse of discretion to fail to award relief under § 1117 that is adequate to make willful trademark infringement unprofitable."); *Otis Clapp & Son, Inc. v. Filmore Vitamin Company*, 754 F.2d 738, 744 (7th Cir. 1985) ("[T]he monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty.").  The ability of the district court to increase the award of profits under § 1117(a) is limited only by the admonition that the award may not constitute a penalty.  *Id*. at 744-45.  The decision to adjust the profits awarded is within the sound discretion of the district court.  *Id*; *See also Playboy*, 692 F.2d at 1275; *Boston Professional Hockey v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71, 77 (5th Cir. 1979).

Factors that the Court can consider in adjusting the profits include:  (1) whether the amount adequately compensated Mattel for the infringement and intentional dilution of its SEE 'N SAY Marks, *see Playboy*, 692 F.2d at 1275; (2) whether Super Duper's actions were willful,

*see U.S. Olympic Committee v. Union Sport Apparel*, 220 U.S.P.Q. 526, 530 (E.D. Va. 1983);

*Taco Cabana International, Inc. v. Two Pesos, Inc*., 932 F.2d 1113, 1127 (5th Cir. 1991);

(3) whether the amount of the award was sufficient to make the infringement or dilution

unprofitable, *see Reebok*, 970 F.2d at 559; and (4) whether the imprecise profit award fails to do

justice, particularly where the imprecision results from the infringer's conduct, *e.g.,* withholding

or insufficient sales records, *see Boston Professional Hockey*, 597 F.2d at 77; *Taco Cabana*,

932 F.2d at 1127.

     Mattel asks that the Court exercise its discretion and adjust and increase the award of

profits to Mattel based on the solid evidence presented by Mattel's financial expert.

### B.    <u>The Evidence of Profits at Trial</u>

     Under the Lanham Act, the trademark owner is required only to present proof of the

infringer's gross revenues.  The infringer must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117(a); *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 940-41 (7th Cir. 1989); *see*

*also Wesco Manufacturing, Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484,

1488 (11th Cir. 1987) ("It is enough that the plaintiff proves the infringer's sales.  The burden

then shifts to the defendant, which must prove its expenses and other deductions from gross

sales.")

     Here, Mattel's financial expert, Charles Phillips, presented proof of Super Duper's gross

revenues with respect to all of the Infringing Marks.  Separately, Super Duper's own financial

expert, Dr. Charles Alford, calculated a very similar amount.  As such, the gross revenues for

sales of products sold under the Infringing Marks are not materially in dispute.  The opinions of

the two experts, however, greatly differ with respect to which expenses they believe are

reasonable to deduct in order to accurately calculate Super Duper's profits.  Consequently, the

jury when determining the appropriate profit award was presented with two very different opinions.

In its verdict, the jury awarded Mattel a profit award of $400,000, inexplicably far below the amount determined by Mattel's financial expert, Charles Phillips, and allocated profits for products where there was no evidence of any sales presented by either party. Below is a table identifying the jury award for each of the Infringing Marks and the amounts calculated by the parties' financial experts, Dr. Alford and Mr. Phillips.

| Super Duper Infringing Mark | Jury Award | Dr. Alford's Profits Calculation | Mr. Phillips' Profits Calculation |
|---|---|---|---|
| SEE IT SAY IT | $ 63,333 | $ 73,249 | $152,601 |
| SAY AND SING | 20,002 | (18,656) | 15,946 |
| FISH AND SAY | 63,333 | no sales | no sales |
| FISH & SAY | 63,333 | 150,010 | 352,698 |
| SORT AND SAY | 63,333 | no sales | no sales |
| SORT & SAY | 63,333 | (137,990) | 477,868 |
| SAY AND SORT | 63,333 | no sales | no sales |
| **TOTALS** | **$400,000** | **$223,259[2]** | **$999,113** |

From this table, it would appear that the jury allocated profits for some of the Infringing Marks for which there was no evidence of sales. For other marks, the jury decreased the profit award well below the amounts calculated by either of the parties' financial experts. The only credible evidence at trial as to Super Duper's deductible costs came from Mattel's expert.

Under 15 U.S.C. § 1117(a), Mattel requests the Court to increase the award of profits to Mattel to the amount found by Mattel's financial expert, or to some other amount that the Court deems just, according to the circumstances of this case.

---

[2]    Mattel did not consider the purported losses for certain Infringing Marks because an infringer does not get an offset for losing money on an infringing product and because Mattel should not be prejudiced by Super Duper's inefficiency. *See Otis Clapp*, 754 F.2d at 744.

C.     <u>**The Circumstances Support an Increase in the Awarded Profits**</u>

First, the total amount of profits proved by Mattel's expert (as discussed in detail below) was $999,113 for the Infringed Marks.  The jury awarded bout 40% of those profits, apparently giving Super Duper large unproved deductions.  That amount is not adequate in light of the infringement and dilution of Mattel's trademarks, particularly where Super Duper dragged Mattel into federal court in its home jurisdiction, refused to allow the PTO to decide this dispute, and now refuses to stop its unlawful activities.

Second, the jury found intentional dilution of Mattel's famous SEE 'N SAY and THE FARMER SAYS trademarks.  The Court heard the significant evidence of willful acts by Super Duper.  Indeed, Super Duper has a pattern of knocking off famous toy trademarks or entertainment properties, *e.g.,* SILLY SNAKES & LADDERS - copied from the famous board game CHUTES & LADDERS and using an identical board for the game, and MARTHA MOUSE - copied from MINNIE MOUSE, down to her red and white polka-dot dress and matching bow between her ears.  The Court also heard the staggering inconsistencies from Super Duper about its knowledge of Mattel's famous SEE 'N SAY trademark.  Super Duper claimed that the first time it learned of the SEE 'N SAY mark and registrations was when Mattel filed its opposition to the SORT AND SAY application in 2004.  Yet at trial, *finally*, after the Court prompted Super Duper's CEO to tell the truth, Super Duper conceded that its admissions served in discovery, in both the PTO proceedings and this case, were false and its interrogatory answers served in this case and the PTO case were also false.  Super Duper also conceded that its principals had a SEE 'N SAY product in their house for their children and its CEO had one in his house when he was growing up.

Third, the award is not sufficient to make the infringement and dilution unprofitable to

Super Duper.  The amount of the award was minimal compared to the profits proved by Mattel's

expert, who actually only had to establish Super Duper's gross sales.  With such a small award

and Super Duper's pattern of copying other trademarks, there is no financial incentive for Super

Duper to stop its unlawful actions.  In fact, Super Duper has stated publicly that it does not agree

with the jury verdict and is continuing its infringing and dilutive actions to this day.

Fourth, Mr. Phillips provided the most credible testimony concerning Super Duper's

profits from the Infringing Marks.  Dr. Alford's first report responsibly stated that he would have

to study and review financial records for at least the period of infringement.  In his second report,

Dr. Alford had to come up with profit figures without records supporting costs and deductions

for many of the years at issue because no such records existed.  Thus, Dr. Alford was unable, due

to the state of Super Duper's records, to follow the standard he set out in his own first report.

Mr. Phillips gave credit in his own first report.  Mr. Phillips gave credit for all existing records

for all truly variable costs, and thus provided the most credible evidence of Super Duper's

products for the Infringing Marks.

As shown below, the credible evidence of profits was presented by Mattel's financial

expert, and the Court should use those figures and Mr. Phillips' testimony to increase the profits

and attribute them to Infringing Marks where there was evidence of sales.

### D.     <u>Super Duper's Expert Provided Evidence That Is Not Credible</u>

Courts often exercise its discretion to adjust monetary awards where the court determines

that certain costs were inappropriately deducted in calculating the award for profits.  *See*, *e.g.*,

*Abbott Laboratories v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000) (refused

to deduct costs because costs would have been incurred even without the sale of the infringing

product); *Burger King Corp. v. Pilgrim's Pride Corp.*, 934 F. Supp. 425, 426 (S.D. Fla. 1996)

(Refused cost deductions because costs did not specifically relate to the sales of the infringing products); *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980) (Refused cost deductions because some costs were not shown to be associated with the infringing products and refused apportioned overhead costs because the infringing product constituted a small percentage of the infringer's business); *Clamp Mfg. Co. v. Enco Mfg. Co.*, 5 U.S.P.Q.2d 1643, 1648 (C.D. Cal. 1987) (Refused deduction of costs because infringers did not provide evidence concerning how the alleged deductible costs, which were computed on an allocation basis, contributed to the sale of the infringing products); *Wolfe v. National Lead Co.*, 272 F.2d 867, 873 (9th Cir. 1959) (Found deduction of portion of corporate officers' salaries of a close corporation not proper); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F.2d 1352, 1373 (declined to deduct payroll, advertising and operating costs because there was no evidence that the costs were actually associated with the infringing sales).

That is precisely the case here.  Super Duper's expert, Dr. Alford, provided an opinion in which his calculation of profits included deductions for cost of materials and a number of "incremental" expenses that are simply not credible and are based on a so-called "smell test," rather than proper legal deductions in a trademark case.  (Pietrini Decl. ¶ 19,  Ex. P - Plaintiff's Trial Ex. 53, Ex. 1.)

### 1.    Dr. Alford's Approximation of the "Cost of Materials" is Speculative

Dr. Alford provided a "cost of materials" for every year that Super Duper sold the infringing products despite the fact that Super Duper did not have the majority of the data necessary to make those calculations.  (Pietrini Decl. ¶ 19,  Ex. P- Plaintiff's Ex. 53, Ex. 2.)  Dr. Alford explained that, in order to fill in the missing gaps, he applied a mathematical calculation he called a "geometric rate of change" over the missing periods of time.  (Pietrini Decl.¶ 16,

Ex. M - 4/24/08 Tr., p. 71.)  Mattel's expert, Mr. Phillips disagreed that such a calculation could

possibly be accurate considering that Super Duper was missing cost data for 12 of the 19 years

(or almost two-thirds) of the relevant time periods.  (Pietrini Decl.¶ 17,  Ex. M - 4/24/08 Tr., pp.

126-127.)  Furthermore, Mr. Phillips opined that the missing data could not be approximated in

this manner because Super Duper had not established a relationship between the number of units

sold and the cost of materials from one period of time to another.  (Pietrini Decl. ¶ 17,  Ex. M -

4/24/08 Tr., p. 127.)

Indeed, Super Duper cannot meet its burden of proving that its "cost of materials" is an

appropriately deductible expense given that it did not produce <u>any</u> business records supporting

those expenses.  *Landes Manufacturing Co., et al. v. Chromodern Chair Company*, 203 U.S.P.Q.

337, 340 (C.D. Cal. 1978) (quoting *Wolfe*, 272 F.2d at 872) ("When testimony relating to

deductible costs is 'based not upon records but upon recollection, estimate and approximation'

the infringer cannot be said to have met his burden.").  Such unsupported figures are not

trustworthy.  *Id.*  Therefore, Super Duper "is not entitled to deduct any costs of the infringing

activities, where its business records are missing or incomplete since an assessment would be

entirely speculative."  *Id.*

Moreover, Super Duper may not deduct expenses that it has not established actually

relate to the sale and production of the infringing product.  *Burger King Corp.*, 934 F. Supp. at

426; *see also* Restatement (Third) of Unfair Competition § 37, comment h ("Internal

apportionments made by the defendant are not necessarily determinative.  Only costs directly

attributable to the production of the infringing goods are deductible."); *Frank Music Corp. v.*

*Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985) (An infringer may only deduct

expenses where he can demonstrate they were "of actual assistance in the production,

distribution or sale of the infringing product.").

Based on the foregoing, Super Duper's "cost of materials" amounts calculated by the "geometric rate of change" to fill in the missing gaps in its business records are speculative and have not been shown to be directly attributable to the production of Super Duper's infringing products.  The "cost of materials" amounts for those years should not be deducted for the purpose of calculating Super Duper's profits.

### 2.     Super Duper's Incremental Operating Expenses Are Not Deductible

Dr. Alford's expert report also deducted ten "incremental" operating expenses that he believed were reasonably deductible.  (Pietrini Decl. ¶ 19,  Ex. P - Plaintiff's Ex. 53, Ex. 4.)  As is the case with respect to Super Duper's "cost of materials", Super Duper did not produce any financial statements for those ten expenses that occurred during the first nine of the nineteen years that Super Duper's infringing products were sold.  Again, Dr. Alford filled in the missing gaps using the "geometric rate of change" discussed above.  Mr. Phillips opined that such assumptions are not appropriate because Super Duper did not provide any evidence to suggest that the relationship between expenses and revenue in the first nine years would be the same as those that occurred in the last ten years.  (Pietrini Decl. ¶ 17,  Ex. N - 4/24/08 Tr., pp. 128-129.)  As discussed above, amounts calculated by the "geometric rate of change" in lieu of business records are speculative at best and should, therefore, should not be deducted for the purpose of calculating Super Duper's profits.

Additionally, it is Mr. Phillips' opinion that many of Super Duper's ten "incremental" expenses are not avoidable (or fixed) and are, therefore, not likely to increase in relation to any increased production of Super Duper's infringing products.  Mr. Phillips explained that some of the expenses are not supported by data or that there was insufficient information to draw a

conclusion within a reasonable degree that such expenses were related to sales of Super Duper's infringing products such that they are actual incremental expenses. (Pietrini Decl. ¶ 17, Ex. N - 4/24/08 Tr., p. 129-130.) Super Duper may not deduct incremental costs where it has not provided evidence that increased production of the infringing products actually increased those expenses. *Maltina Corp.*, 613 F.2d at 586; *see also Clamp Mfg. Co.*, 5 U.S.P.Q.2d at 1648 (costs were not properly deductible because the infringer did not offer any evidence concerning how the alleged deductible costs were computed or how they contributed to the sale of the infringing products). Dr. Alford did not have a reasonable basis to make such an assumption and those incremental expenses should not be deductible. (Pietrini Decl. ¶ 17, Ex. N  4/24/08 Tr., pp. 129-30.)

As stated above, Dr. Alford's data with respect to the first nine years of the ten "incremental" operating expenses is purely speculative and should not be deducted. Moreover, Super Duper cannot meet its burden of proving that all ten "incremental" operating expenses are appropriately deductible expenses because it did not produce evidence that those expenses were incurred <u>as a result</u> of the sales of Super Duper's infringing products.

### 3.    Salaries of Mr. and Mrs. Webber and Other Staff Are Not Deductible

Dr. Alford also deducted what he called "Incremental Product Development Wage Costs", which included the wages of Thomas Webber and his wife, Sharon Webber, and editors and artists that developed the products under Super Duper's Infringing Products. (Pietrini Decl. ¶ 16, Ex. M - 4/24/08 Tr., p. 76-77.) Again, Super Duper has no business records to substantiate Dr. Alford's deductions. (Pietrini Decl. ¶ 16, Ex. M - 4/24/08 Tr., p. 114.) In fact, Dr. Alford testified that Thomas Webber (only after this lawsuit began) developed a summary of the hours invested by himself, Sharon Webber, and editors and artists that <u>he believed</u> were

necessary to develop each of Super Duper's products in their product lines specifically for Dr.
Alford's analysis.  (Pietrini Decl. ¶ 16,  Ex. M - 4/24/08 Tr., p. 78) (Dr. Alford:  "I think they
developed this as a result of my asking for it.").  Then, in order to calculate the product
development incremental costs, Dr. Alford combined this "manufactured" information with the
wages each year that Thomas and Sharon Webber paid themselves as owners of Super Duper.
(Pietrini Decl. ¶ 16,  Ex. M - 4/24/08 Tr., pp. 79-82.)  In other words, Dr. Alford combined their
numbers of hours and wages necessary (both of which were established by Thomas and Sharon
Webber) to calculate the product development incremental costs.

The salaries of Thomas and Sharon Webber and the other staff members for product
development should not be deducted.  First of all, Mr. Phillips states that Dr. Alford did not
obtain sufficient, relevant data as to whether the expenses were really incurred, especially
knowing that the summary of hours was developed by Thomas Webber after the litigation began,
and was unsupported by any documents or evidence.  (Pietrini Decl. ¶ 17,  Ex. N - 4/24/08 Tr., p.
130.)  Super Duper may not deduct expenses that it has not established actually relate to the sale
and production of the infringing products.  *Burger King Corp.*, 934 F. Supp. at 426; *see also
Restatement (Third) of Unfair Competition* § 37, comment h ("Internal apportionments made by
the defendant are not necessarily determinative.  Only costs directly attributable to the
production of the infringing goods are deductible.").  Furthermore, deductions of corporate
officer's salaries of a close corporation are not proper.  *Wolfe*, 272 F.2d at 873.

In addition, it is Mr. Phillips' belief that Thomas and Sharon Webber's salaries are not
variable but rather fixed expenses.  In other words, their salaries were not avoidable because they
were paid the salary regardless of whether they did any product development work or not.
(Pietrini Decl. ¶ 17,  Ex. N - 4/24/08 Tr., pp. 131-32.)  Super Duper may not deduct costs if those

costs would have been incurred even without the sale of the infringing product.  *Abbott*

*Laboratories*, 218 F.3d at 1242; *see also Nike Inc.*, 274 F.2d at 1373 (the court declined to

deduct payroll, advertising and operating costs because there was no evidence that the costs were

associated with the infringing sales).  This conclusion is underscored by the fact that it is

undisputed that the Webbers set their salaries at the beginning of the year, before they knew how

much time they might contribute to what projects.

Because Dr. Alford's "Incremental Product Development Wage Costs" are based on a

"manufactured" number of hours and wages that are actually fixed costs, those costs should not

be deducted for the purpose of calculating Super Duper's profits from the sales of the infringing

products.

**E.**       **Mattel's Expert Provided the Only Credible Evidence Available to the Jury**

The only credible evidence available to the jury regarding the appropriate calculation for

profits from the sales of Super Duper's infringing products was provided by Mattel's financial

expert, Charles Phillips.  Many of the deductions in Dr. Alford's profit calculations are not

proper, as they are either unsupported by business records or have not been demonstrated to have

been incurred as a result of the sale of the infringing products.

Mr. Phillips deducted only those expenses for which Super Duper produced supporting

business records or demonstrated a reasonable relationship to the sale of the infringing products.

For example, Mr. Phillips excluded Super Duper's "cost of materials" or incremental expenses

for years in which Super Duper did not produce any supporting business records, and he

excluded six of Super Duper's ten "incremental" expenses that he found were not supported by

evidence that they were incurred as a result of sales of the infringing products.  He did, however,

include four of Super Duper's "incremental" expenses – shipping and packing supplies, postage

and shipping, merchant charges and office expenses.  Mr. Phillips prepared a summary document

of his calculation of Super Duper's profits from the sales of the infringing products.  (Pietrini

Decl. ¶ 18,  Ex. O - Defendant's Exhibit No. 971.)  That summary should be the basis on which

the Court adjusts the profits awarded to Mattel -- first, to reallocate profits awarded where no

sales were established, and second, to increase the profits awarded for the Infringing Marks

where sales were proved at trial.  Dr. Alford's swirling numbers with no evidentiary support and

the minimal differences between the various Infringing Marks, *e.g.,* FISH & SAY products had

sales, but FISH AND SAY products had no sales, caused an allocation of profits that was not

entirely based on the sales evidence presented at trial.  Mattel asks the Court to use its discretion

to adjust the award and enter an award of profits based on the credible evidence submitted by

Mattel.

The credibility of Mr. Phillips' determinations is highlighted by the fact that he is a well-

qualified Certified Public Accountant, with years of experience in running a business, managing

accounting firms, and advising businesses on accounting and business principles.

In sum, Mattel seeks to invoke the Court's discretion to increase profits from the amount

of $400,000 awarded by the jury, to an amount that is substantiated by the gross sales and profits

figures calculated by Mr. Phillips.  Based on the foregoing, the only credible evidence that was

available to the jury on Super Duper's profits was provided by Mr. Phillips.  Doubts concerning

deductions should be resolved against the infringer.  *Louis Vuitton S.A. v. Spencer Handbags*

*Corp.*, 765 F.2d 966, 972-973 (2d Cir. 1985).  This is so because "[t]he trial court's primary

function is to make violation of the Lanham Act unprofitable to the infringing party."  *Roulo*,

886 F.2d at 940-41 (7th Cir. 1989); *see also Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d

1132, 1135 (9th Cir. 1986) (quoting *Playboy Enter., Inc. v. Baccarat Clothing Co.*, 692 F.2d

1272 (9th Cir. 1982) (Section 1117(a)'s primary purpose "is to 'take all the economic incentive

out of trademark infringement.'").

Mattel leaves it to the Court's discretion as to the amount to increase or adjust the award

of profits to Mattel under 15 U.S.C. §1117(a).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Mattel respectfully requests that the Court enter a judgment

including a permanent injunction, an order for cancellation, and an increase of the award of

profits to Mattel in an amount the Court deems just and appropriate under the circumstances.

Because the judgment is one that must be entered by the Court under FRCP 58(b), Mattel seeks

entry of judgment in the form submitted herewith or, in the alternative, to amend or alter the

judgment pursuant to FRCP 59(e).[3]

Respectfully submitted,

Dated:  May 13, 2008

<u>Co-Counsel</u>:

MANATT, PHELPS & PHILLIPS, LLP
Jill M. Pietrini
Raphael A. Gutiérrez
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:       (310) 312-4000
Facsimile:        (310) 312-4224

*Attorneys for Defendant*
*and Counterclaimant* MATTEL, INC.

By:   <u>s/ Frank S. Holleman III</u>
      Frank S. Holleman III
      (D.S.C. Id. No. 1911)
      WYCHE BURGESS FREEMAN &
      PARHAM, P.A.
      Post Office Box 728
      Greenville, South Carolina 29602-0728
      Telephone:  (864) 242-8200
      Facsimile:   (864) 235-8900
      fholleman@wyche.com

      *Attorneys for Defendant*
      *and Counterclaimant* MATTEL, INC.

---

[3]    The Court may complete the judgment as to costs and attorneys' fees upon consideration of
Mattel's application to tax costs and motion for attorneys' fees under 15 U.S.C. § 1117(a); FRCP
58(e).